**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio, *motion for pro hac vice forthcoming*
nmigliaccio@classlawdc.com
Jason S. Rathod, *motion for pro hac vice forthcoming*
jrathod@classlawdc.com
412 H Street NE, Suite 302
Washington, D.C. 20002
Tel: (202) 470-3520

**LEVIN SEDRAN & BERMAN**
Daniel C. Levin,
dlevin@lfsblaw.com
Charles E. Schaffer, motion for *pro hac vice* forthcoming
cschaffer@lfsblaw.com
Nicholas J. Elia, motion for *pro hac vice* forthcoming
nelia@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663

**BAIRD LAW FIRM**
William A. Baird, Esq. (SBN 192675)
w.baird.law@gmail.com
2625 Townsgate Road, Suite: 330
Westlake Village, Ca. 91361
Telephone:  (805)-267-1209

*Counsel For Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORENZO FORD, TINA FOREHAND, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>HYUNDAI MOTOR AMERICA, a Corporation; and HYUNDAI MOTOR COMPANY, a business entity;<br><br>      Defendants. | CASE NO. 8:20-cv-00890<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) Breach of Express Warranty<br>(2) Breach of Implied Warranty of Merchantability<br>(3) Violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*<br>(4) Common Law Fraud<br>(5) Unjust Enrichment<br>(6) Violations of the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq.*<br>(7) Violations of the Washington Consumer Protection Act, Wash. Rev. Code. 19.86, *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

-1-

Plaintiffs Lorenzo Ford and Tina Forehand (collectively, "Plaintiffs"), by and through their attorneys, individually and behalf of all others similarly situated, bring this action against Defendant Hyundai Motor America ("HMA") and Hyundai Motor Company ("HMC"), (collectively, "Hyundai" or "Defendants"). Plaintiffs allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel as to all other allegations:

**INTRODUCTION**

1.      Plaintiffs bring this consumer class action lawsuit because Defendants manufactured, marketed, distributed, and sold the 2020 Hyundai Palisade (the "Class Vehicle") without disclosing to purchasers and lessees of the Class Vehicles that the Class Vehicles' windshields crack, chip, and otherwise break spontaneously or without reasonable explanation (the "Defect"). The Defect creates a serious safety issue and is therefore a material fact. Defendants have been unwilling to acknowledge the Defect, much less remedy it, and Plaintiffs hereby seek to correct that injustice.

2.      Defendants market the Class Vehicle as Hyundai's "flagship premium" sports utility vehicle ("SUV") offering consumers "exceptional comfort, technology, and safety" and "new levels of all-road, all-weather capability, technology, [and] safety" backed by the "Hyundai Assurance—our promise to deliver peace of mind to our customers." *All-New 2020 Hyundai*

*Palisade Mid-size SUV Makes its Global Debut at the 2018 Los Angeles Auto Show*, Hyundai.com (Nov. 28, 2018), *available at*

https://www.hyundainews.com/models/hyundai-palisade-2020-palisade (last visited March 19, 2020).

3.     Defendants also provide a comprehensive warranty scheme that guarantees the material workmanship of the Class Vehicles and specifically provides for the repair or replacement of defective components in the Class Vehicles.

4.     Defendants began marketing the Class Vehicle in North America in the Summer of 2019. Within months owners and lessees of Class Vehicle began reporting problems with the windshields in their vehicles.

5.     A typical account of the Defect starts with a small chip in the windshield glass, sometimes in response to contact with a small object such as a pebble or bug but often with no impact. The chip quickly expands into a major crack or "spiderweb" of cracks. Alternatively, cracks can appear suddenly and without warning in the windshield glass. Owners and lessees often experienced the Defect shortly after purchase—even on the first drive home from the dealership.

6.     The Defect poses a serious safety hazard to drivers, passengers, and pedestrians. A spontaneously cracking or severely cracked windshield can impair the driver's view and distract the driver. "Even a small crack on glass means your

windshield's structural integrity has been compromised, which means it is now a safety hazard to you and your passengers." Philip Thompson, *Can a Cracked Windshield Shatter?*, Glass.com (Jan. 16, 2017), *available at* https://info.glass.com/can-a-cracked-windshield-shatter (last visited March 19, 2020). "Driving with a damaged or cracked windshield can hinder a motorist's visibility and also compromise the structural integrity of the automobile during a roll-over incident." *Auto Club Says Motorists Who Drive With Cracked or Damaged Windshields May Be Placing Themselves in Harm's Way*, AAA.com (Jan. 19, 2007), *available at* http://news.aaa-calif.com/news/07-01-19-windshield-damage (last visited March 19, 2020). In addition, "[a]uto glass is supposed to meet federal safety standards and is imperative for airbags to function properly." *Id*.

7.    Dozens of owners and lessees of the Class Vehicles have voiced complaints about the Defect on the official complaint database of the National Highway Transportation Safety Authority ("NHTSA"), as well as various online forums. For example, one complaint lodged with the NHTSA describes a manifestation of the Defect as follows:

> Within two weeks of purchasing the vehicle, a crack developed in the middle of the windshield, just below the rear-view mirror mount. Per the dealership recommendation we went to Safelite for an opinion about the cause, since we had no memory of anything hitting the windshield, and the Safelite manager provided a written opinion (via email) that there was no evidence of impact,

1
2
3

> and it was his opinion that there was a defect in the glass.
> Hyundai corporate stated that since we could not prove a
> defect existed, it would not be covered by warranty.

4    NHTSA Complaint ID No. 11280516 (Nov.16, 2019), *available at*

5    https://www.nhtsa.gov/vehicle/2020/HYUNDAI/PALISADE/SUV/FWD#complai

6
7    nts (last visited March 18, 2020).

8        8.    Other accounts from consumers who have been impacted by the

9    Defect show that their concerns are routinely dismissed by Defendants and

10   Hyundai dealerships (who are agents of Defendants). When a windshield chips or

11
12   cracks due to the Defect, Hyundai and/or their dealerships routinely deny the

13   existence of the Defect. Instead, they place the blame on the owner or lessee,

14
15   forcing them to pay for the replacement out of pocket or to rely on their insurer,

16   even though every instantiation of the Defect has occurred during the warranty

17   period.

18
19       9.    Furthermore, many consumers report having to replace their

20   windshields multiple times, presumably because the Defect inheres in Defendants'

21   windshields for the Class Vehicles or the design of the windshield assembly. Upon

22
23   information and belief, the Class Vehicles all contain the same type of windshields,

24   and the Defect is inherent in each Class Vehicle and was present at the time of sale.

25   Replacement windshields provided by Defendants suffer from the same defect and

26
27   are, therefore, equally defective and dangerous. Multiple members of the Class

28   have complained that the Defect appeared in both the factory-installed windshield

-5-

and the replacement windshield of their Class Vehicles.

10.    Plaintiffs and members of the Class (defined below) who have experienced the Defect have been forced to pay up to $1,600 each time they have to replace a windshield.

11.    In addition to the windshield replacement cost, owners and lessees almost always incur other expenses resulting from the defect. Many owners and lessees impacted by the Defect have had to pay additional sums for the recalibration and realignment of components that are subsidiary to the windshield, such as the rear-view camera and Heads Up Display technologies. Those impacted by the Defect also must expend time and money to bring their vehicles in for repair and lose use of the vehicles while they are being repaired. Cracks in the windshield prevent the safe and proper operation of some safety technology in the Class Vehicle.

12.    Selling vehicles with dangerously defective windshields and refusing to take responsibility for the defects is a fraud on consumers. Hyundai refuses to honor its commitment to its loyal customers, is jeopardizing the safety of the public, and is forcing its customers to bear the expense of its mistakes and malfeasance.

13.    As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.

Plaintiffs and the Class members expended monies to repair the Defect and suffered financial and other injuries relating thereto. They have also suffered from a diminution in value of the Class Vehicles owing to the existence of the Defect. Accordingly, Plaintiffs and the Class members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.  The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

14.    Defendants were aware of the Defect. Not only do Defendants have exclusive, non-public knowledge and data concerning the Class Vehicle windshield through their own testing data, customers' complaints, warranty claims, and repair orders, they are or should be aware of consumer complaints to the NHTSA and on public forums. Additionally, the Defect has manifested in a vehicle that is manufactured by a company partially owned by Defendants and is essentially identical to the Class Vehicle. Defendants were well aware of the Defect but failed to notify customers of the nature and extent of the problems with Class Vehicle or to provide any adequate remedy.

15.    The Defect is material because it poses a serious safety concern. As attested by Class members in scores of complaints to the NHTSA, and other online forums, the Defect can impair a driver's visibility, cause a distraction, and greatly increase the risk of collision. Additionally, the Defect impairs the function of safety technology in the Palisade.

16.    The Defect also is material because consumers incur significant and unexpected repair costs. Defendants' failure to disclose the defect at the time of purchase is material because no reasonable consumer expects to spend thousands of dollars to repair or replace windshields that crack either spontaneously or due to a mild impact that should not result in cracking.

17.    Had Defendants disclosed the Defect, Plaintiffs and Class members would not have purchased the Class Vehicles or would have paid less for them.

18.    Plaintiffs demand that Defendants accept responsibility for replacing damaged windshields under Hyundai's warranties at no charge to Plaintiffs and the Class and reimburse Plaintiffs and the Class for losses suffered as a result of the Defect. In addition, or alternatively, Defendants should be required to buy back the Class Vehicles.

19.    This case seeks protection and relief for owners and lessees of Class Vehicles for the harm they have suffered, and the safety risks they face, from Defendants' breaches of express and implied warranties and Defendants' unfair, unlawful, and deceptive trade practices.

## II.    JURISDICTION, VENUE AND GOVERNING LAW

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendants are citizens of different states.

-8-

This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

21. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants transact business in this district and are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

22. This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within this district and throughout the United States.

23. In accordance with 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in or emanated from this District, Defendants transact business in this District, and Defendants reside in this District.

## III.    PARTIES

### A.    Plaintiffs

#### i.    Plaintiff Lorenzo Ford

24.    Plaintiff Lorenzo Ford is a citizen of Illinois and resides in Chicago, IL.

25.    On August 30, 2019, Plaintiff Ford purchased a class vehicle from World Hyundai in Matteson dealership located in 5337 Miller Circle Drive, Matteson, IL 60443.

26.    In deciding to purchase a Class Vehicle, Plaintiff Ford relied on Hyundai's representations about the various features of his vehicle, none of which disclosed the Defect described herein.

27.    Plaintiff's windshield cracked at approximately 4,225 miles on the highway when he was on his way to work. His windshield was seemingly impacted by a pebble on the right upper corner and the crack extended to the center of his windshield.

28.    Plaintiff had his windshield replaced Service King Collision, located in 7100 McCormick Blvd., Lincolnwood, IL 60712, and paid $880.13 out of pocket for the work.

29.    Plaintiff Ford has paid out of pocket for one windshield replacement and has never received a reimbursement from Defendants.

30.    Had Mr. Ford known of the Defect at the time of sale, he would not

have purchased the vehicle or would have paid less for it to account for the defect.

### ii. Plaintiff Tina Forehand

31.    Plaintiff Tina Forehand is a citizen of Washington and resides in Woodinville, WA.

32.    On August 2019 Plaintiff Forehand purchased a Class Vehicle from Jack Carrol Skagit Hyundai, a licensed Hyundai dealer located in 1313 Goldenrod Road, Burlington, WA 98233.

33.    In deciding to purchase a Class Vehicle, Plaintiff Forehand relied on Hyundai's representations about the various features of her vehicle, none of which disclosed the Defect described herein.

34.    Plaintiff's windshield cracked at 2,000 miles upon impact with a small pebble.

35.    Because the vehicle was so new, Plaintiff had to wait approximately three weeks for the replacement windshield to be made available. Speedy Glass, located in 18206 Bothell Way NE, Bothell, WA 98011, requested that the windshield replacement be made in shop since it was their first windshield replacement on a Hyundai Palisade and charged Ms. Forehand $250 out-of-pocket for the work.

36.    Plaintiff Forehand has paid out-of-pocket for one windshield replacement and has never received a reimbursement from Defendants.

37.    Had Ms. Forehand known of the Defect at the time of sale, she would

not have purchased the vehicle or would have paid less for it to account for the defect.

**B. Defendants**

38.    Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States.  Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

39.    Defendant Hyundai Motor Company is a South Korean corporation. HMC is the parent corporation of Hyundai Motor America.  HMC, through its various entities, designs, manufactures, markets, distributes and sells Hyundai automobiles in California and multiple other locations in the United States

40.    Defendant Hyundai Motor America is incorporated and headquartered in the State of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.  HMA is HMC's U.S. sales and marketing division, which oversees sales and other operations across the United States.  HMA distributes Hyundai vehicles and sells these vehicles through its network of dealers.  Money received from the purchase of a Hyundai vehicle from a dealership flows from the dealer to HMA.

41.    HMA and HMC sell Hyundai vehicles through a network of dealerships that are the agents of HMA and HMC.

42.     There exists, and at all relevant times has existed, a unity of

ownership between HMC, HMA, and their agents such that any individuality or

separateness between them has ceased and each of them is the alter ego of the

others.

43.     Based upon information and belief, Plaintiffs allege that at all times

mentioned herein, each Defendant was acting as an agent and/or employee of each

of the other Defendants, and at all times mentioned was acting within the course

and scope of said agency and/or employment with the full knowledge, permission,

and consent of each of the other Defendants. In addition, each of the acts and/or

omissions of each Defendant alleged herein were made known to, and ratified by,

each of the other Defendants.

44.     Upon information and belief, Defendant HMC communicates with

Defendant HMA concerning virtually all aspects of the Hyundai products it

distributes within the United States.

45.     Upon information and belief, the design, manufacture, distribution,

service, repair, modification, installation and decisions regarding the windshield

of the Class Vehicles as it relates to the Defect within the Class Vehicles were

performed exclusively by Defendants HMA and HMC and/or their agents.

46.     Upon information and belief, Defendants HMA and HMC developed

the post-purchase owner's manuals and warranty booklets for the Class Vehicles.

COMPLAINT

47.     Hyundai engages in continuous and substantial business in California and Washington.

48.     HMA, headquartered in Fountain Valley, California, is a subsidiary of Hyundai Motor Corporation, a South Korean corporation. Hyundai Motor Corporation, a multinational corporation with nearly 80,000 employees, is the fourth-largest automobile manufacturer in the world.

49.     In 1998, HMC purchased 51% of Kia Motors ("Kia"), another South Korean car manufacturer. Today, HMC owns approximately 32% of Kia.

50.     More than 50% of Hyundai vehicles sold worldwide are sold in the United States, where HMA manages domestic sales, marketing and distribution of Hyundai vehicles and employs approximately 32,000 people at Hyundai dealerships throughout the United States.

51.     Hyundai maintains testing facilities and equipment in California City, California, where it conducts pre-sale durability testing, among other things

IV.    **FACTUAL ALLEGATIONS**

    **A. The Class Vehicle**

52.     The Hyundai Palisade is a "premium" mid-size SUV that is Hyundai's "flagship" SUV. *All-New 2020 Hyundai Palisade Mid-size SUV Makes its Global Debut at the 2018 Los Angeles Auto Show*, Hyundai.com (Nov. 28, 2018), *available at* https://www.hyundainews.com/models/hyundai-palisade-2020-palisade (last visited March 19, 2020). Defendants marketed the Palisade as

offering "exceptional comfort, technology, and safety" and "new levels of all-road, all-weather capability, technology, [and] safety" backed by the "Hyundai Assurance—our promise to deliver peace of mind to our customers." *Id.*

53.    The Class Vehicle debuted at the 2018 Los Angeles Auto Show on November 28, 2018 and began sales in North America in the summer of 2019. Zac Palmer, The largest Hyundai ever breaks cover, AutoBlog.com (Nov. 28, 2018) *available at* https://www.autoblog.com/2018/11/28/hyundai-palisade-suv-supersizes-it-at-at-l-a-auto-show/#slide-endcap (last visited March 18, 2020).

54.    Customers began complaining about the Defect within months of the vehicle's release, with accounts of the Defect appearing as early as September 2019.

**B. The Defect Poses a Serious Safety Concern**

55.     The Class Vehicles' windshields are defective and dangerous due to the fact that the windshields crack, chip and otherwise break spontaneously or without reasonable explanation.

56.    Many Class Vehicle owners and lessees have reported experiencing the Defect, often shortly after purchase. The Defect often manifests as a small chip in the glass, sometimes in response to contact with a small object such as a pebble or bug but often not in response to any impact and with no perceptible cause. This initial chip quickly expands into a major crack or "spiderweb" of cracks.

57.     The Defect poses a serious safety hazard to drivers, passengers, and pedestrians. It is dangerous and illegal to drive a vehicle with a chipped, cracked, or shattered windshield because it impairs the driver's view and the damage can expand while driving.

58.     The windshield is a safety feature in itself. It protects the driver and passengers from outdoor debris and acts in concert with the vehicle airbags and seatbelts to protect the driver and passengers in the event of an accident. If the windshield is defective, it may not provide adequate support to the driver and passenger airbags to minimize injury.

59.     In addition to its protective function, the windshield is a structural component of vehicles. "Even a small crack on glass means your windshield's structural integrity has been compromised, which means it is now a safety hazard to you and your passengers." Philip Thompson, *Can a Cracked Windshield Shatter?*, Glass.com (Jan. 16, 2017), *available at*  https://info.glass.com/can-a-cracked-windshield-shatter (last visited March 19, 2020). "Driving with a damaged or cracked windshield can hinder a motorist's visibility and also compromise the structural integrity of the automobile during a roll-over incident." *Auto Club Says Motorists Who Drive With Cracked or Damaged Windshields May Be Placing Themselves in Harm's Way*, AAA.com (Jan. 19, 2007), *available at* http://news.aaa-calif.com/news/07-01-19-windshield-damage (last visited March 19, 2020). In addition, "[a]uto glass is supposed to meet federal safety standards

-16-

and is imperative for airbags to function properly. " *Id*.

### C. Defendants Had Superior and Exclusive Knowledge of the Defect

60.     Upon information and belief, Defendants knew, or should have known, about the Defect through their exclusive knowledge of non-public, internal data about the Defect, including: (1) pre-release testing data; (2) their own records of customers' complaints about the Defect to Defendants' dealers for vehicle repairs; (3) aggregate data from Defendants' dealers, including their repair records and orders; (4) consumer complaints to the NHTSA and resulting notice from the NHTSA; (5) warranty and post-warranty claims; (6) testing conducted in response to owner or lessee complaints; and (7) other internal sources of aggregate information about the problem. Additionally, Defendants should have been aware of the Defect because of the large number of public complaints about the inexplicable cracking and chipping of the windshields of the Class Vehicles. Defendants were well aware—or should have been aware—of the Defect but failed to notify its customers of the nature and extent of the problems with Class Vehicles or provide any adequate remedy for the Defect.

61.     Defendants are experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendants conduct tests, including pre-sale testing, on incoming components, including the windshield, to verify the parts are free from defect and meet Defendants' specifications. Based

on the results of these tests, Defendants knew or should have known the

windshield was defective and likely to put consumers in a dangerous position due

to the inherent risk of the Defect.

62.    Consumer complaints to the NHTSA also suggest that Hyundai was

aware of the Defect but chose to deny its existence. The following sampling of

complaints to the NHTSA concerning the Class Vehicles demonstrates the

manifestation of the Defect, the safety risk the Defect poses, and the Defendants'

unwillingness to remedy the Defect.

| **Complaint Date:** Nov.16, 2019 | **NHTSA ID Number:** 11280516 |
|---|---|
| **Summary:** | |
| Within two weeks of purchasing the vehicle, a crack developed in the middle of the windshield, just below the rear-view mirror mount. Per the dealership recommendation we went to Safelite for an opinion about the cause, since we had no memory of anything hitting the windshield, and the Safelite manager provided a written opinion (via email) that there was no evidence of impact, and it was his opinion that there was a defect in the glass. Hyundai corporate stated that since we could not prove a defect existed, it would not be covered by warranty. | |

| **Complaint Date:** March 8, 2020 | **NHTSA ID Number:** 11316904 |
|---|---|
| **Summary:** | |
| A crack in the front windshield after rock/debris had nicked the front windshield while on the freeway. The crack quickly keeps on expanding in a short period of time after getting nicked. | |

| **Complaint Date:** Oct. 21, 2019 | **NHTSA ID Number: 11270087** |
|---|---|
| **Summary:** | |

COMPLAINT

While in motion on a highway a very small foreign object hit the lower side of the windshield in front of the driver. The sound of the hit was barely audible so the object had to be very small. I don't see how such a small object could break a windshield on a 2 week old vehicle.

| **Complaint Date:** Sep. 22, 2019 | **NHTSA ID Number:** 11257246 |

**Summary:**

Less than 2 months into a brand new vehicle, the windshield cracked during a rainstorm on the highway along the line of the wipers. Nothing hit the windshield other than rain. The dealer is making us pay out of pocket for recalibration and tinting, despite the fact we have insurance. Safelite is replacing the windshield. It took 3 weeks to get the windshield.[1]

63.   The Office of Defects Investigation within the NHTSA conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the Nation's highways.  All vehicle manufacturers, including Defendants, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns (which is backed by criminal penalties). Accordingly, Defendants have—or should be imputed—knowledge of any and all NHTSA complaints. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

---

[1] These complaints and many others are available at the NHTSA website: https://www.nhtsa.gov/vehicle/2020/HYUNDAI/PALISADE/SUV/FWD (last accessed April 9, 2020). A compendium of them also attached hereto as Exhibit 1.

64.     In addition to the numerous complaints lodged with the NHTSA, consumers have discussed the Defect on various online forums dedicated to the Class Vehicles, including HyundaiPalisade.com, PalisadeForum.com, and PalisadeForums.org. For example:

a.  Had a rock hit my Palisade SEL Windshield about a month after I got it. The next day it was cracked all the way across. Was not a cheap fix. Had to get windshield out of Chicago then all cameras behind the rear view mirror had to be realigned. Covered by insurance but had to pay my deductible.[2]

b.  I have a chip at the center of the windshield that quickly turned into an arc shaped crack. I have been procrastinating due to not wanting to put a claim on my insurance. I am also paranoid that I will get another chip soon after getting it repaired. ;) It would be a nice gesture if Hyundai would repair it for free![3]

c.  I have a rock chip in my windshield. It chipped an hour after I bought it on my way home.[4]

d.  We had ours for less than a week, then we noticed a chip middle passenger upper windshield.[5]

e.  We have chip / star with nobody notice anything hitting windshield, Passenger line of site, 1,300 miles. My 2016 MX-5 GT has many specs without crack / star and it has 97k on it. This windshield

[2]     HyundaiPalisade.com, posted November 18, 2019, *available at* https://www.hyundaipalisade.com/threads/has-anyone-experienced-issues-with-cracked-or-chipped-windshield-on-their-palisade.738/ (last visited March 18, 2020).
[3]     *Id*., posted December 12, 2019.
[4]     PalisadeForums.com, posted January 8, 2020, *available at* https://palisadeforums.org/threads/easily-broken-chipped-cracked-windshields.335/ (last visited March 18, 2020).
[5]     *Id.*, posted January 14, 2020.

should not crack this easily and I will be reporting it to Hyundai corporate to see if they will cover my $500 deductible.[6]

f.  Mine was chipped within 200 miles and now with 2000 miles has several small chips. It does seem easily chipped. No cracks at this point however.[7]

g.  Found the forum based upon my newly chipped windshield cracked at highway speed by freezing rain or small pebble.[8]

h.  My wife just called to tell me on the way to work tonight she thought a bug or small pebble hit the windshield and it's got a 2 inch crack. It's a replacement windshield because a pebble cracked it before the first payment and spread from left to right over night[9]

i.  I have the same issue. Small rock hit and made a 1 foot crack. I have never had a glass crack so easy. Would love more information myself.[10]

j.  Mine cracked 2 weeks after I bought it in October. New windshield was $1600. I had to pay $500. Just this week another star crack. It's expanding. Guess another windshield. Changed deductible to $50 for glass. Crazy 2 windshields in 5 months. Something is definitely not right[11]

---

[6]    *Id.*, posted January 14, 2020.
[7]    *Id.*, posted January 14, 2020.
[8]    *Id.*, posted January 18, 2020.
[9]    *Id.*, posted January 19, 2020.
[10]    PalisadeForums.com, posted March 2020, *available at* https://www.palisadeforum.com/threads/windshield.623/ (last visited March 18, 2020).
[11]    *Id.*, posted March 2020.

65. The high quantity and frequency of complaints related to the Defect in the Class Vehicles indicates that Defendant knows about the defective nature of the Class Vehicles but continues to deny consumers relief from the Defect.

66. These complaints also describe numerous encounters between Defendants and their dealers and owners and lessees of the Class Vehicles seeking repair or replacement of their windshields. Defendants should have learned that the Class vehicle windshields failed at a high rate and were defective from the sheer number of reports received from dealerships. Defendants' customer relations department, which interacts with individual dealerships to identify potential common defects, has undoubtedly received numerous reports regarding the Defect. Defendants' customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data. Based on these encounters and the resulting complaints, repair orders, and attempted warranty claims, Defendants knew of the Defect.

67. Consumers who report sudden and inexplicable chips and cracks in the windshields of the Class Vehicles routinely have their concerns dismissed by Hyundai dealers and Defendants. When a windshield chips or cracks due to the Defect, Hyundai routinely denies knowledge of the Defect and denies warranty

claims, instead forcing the consumer to pay for the replacement out of pocket or rely on their insurer to cover a portion of the cost.

68.     Defendants' warranty department similarly analyzes and collects data submitted by their dealerships to identify warranty trends in their vehicles. On information and belief, it is Defendants' policy that when a repair is made in connection with a warranty claim (whether successful or not), the dealership must provide Defendants with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed repair information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

69.     Defendants had superior and exclusive knowledge of the Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiffs and Class members before they purchased or leased the Class Vehicles.

70.     The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them at all.

71.    Reasonable consumers, like Plaintiffs, expect that a vehicle's windshield will function in a manner that will not pose a safety risk and is free from defects. Plaintiffs and Class members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Defect, and will disclose any such defects to their consumers when they learn of them. Plaintiffs and Class members did not expect Defendants to conceal and fail to disclose the Defect to them, and to then continually deny its existence and disclaim warranty coverage.

### D. A Manufacturer Partially Owned by Defendant Recognized the Defect in a Nearly Identical Vehicle

72.    Another indication that Defendant is aware of the Defect is the fact that Kia, another South Korean automobile manufacturer that is partially owned by Defendant HMC, manufactures a vehicle that is almost identical to the Class Vehicle and suffers from an identical defect. In that case, Kia has acknowledged that those windshields are in fact defective and provides affected customers with free replacements and other remuneration and assistance.

73.    The 2020 Kia Telluride suffers from a windshield issue identical to the Defect. There are dozens of NHTSA complaints and accounts on various public forums of the 2020 Telluride windshields chipping and cracking spontaneously or without adequate cause. A sampling of NHTSA complaints is included below:

| Complaint Date: March 3, 2020 | NHTSA ID Number: 11315815 |
| --- | --- |

**Summary:**

I've had my 2020 kia telluride less than two weeks, got into the car which was parked in the garage and the windshield was cracked. Never heard a rock hitting the windshield at any time (I'm the only driver), the crack started in top corner on passenger side and traveled across the top half of the windshield in about 3 hours.

**Complaint Date:** March 9, 2020      **NHTSA ID Number:** 11317000

**Summary:**

The windshield has appeared to crack for no reason. We did receive a letter from kia saying they would replace it but they need to actually recall these windshields if they are having such and issue with them. I've only had it for 4 months. Not sure how long it has been like this but we just noticed it this weekend.

**Complaint Date:** February 21, 2020      **NHTSA ID Number:** 11310546

**Summary:**

My windshield has two cracks in that impairs visibility. It was not hit by debris from the road. The both start from the edge of the glass and spread across the windshield. I contacted the local dealership and can have it replaced for 800.00!!!!!! I think this should be a recall due to it being a widespread issue.

But for the names of the vehicles, the accounts contained in these NHTSA complaints are identical to those pertaining to the Class Vehicles.[12]

74.     On information and belief, the 2020 Kia Telluride and the Class Vehicle use identical windshields and/or windshield assemblies, and employ substantially similar windshield designs.

---

[12]These complaints and many others are available at the NHTSA website: https://www.nhtsa.gov/vehicle/2020/KIA/TELLURIDE/SUV/AWD (last accessed April 9, 2020).

COMPLAINT

75.    Independent observers have noted that the Telluride and the Class Vehicle "are so closely related that a 23andMe genetic test would struggle to tell the two apart." David Beard, *2020 Hyundai Palisade vs. 2020 Kia Telluride: Which All-New Three-Row SUV Is the Best?*, CarAndDriver.com (Oct. 30, 2019), *available at* https://www.caranddriver.com/reviews/comparison-test/a29640131/2020-hyundai-palisade-vs-2020-kia-telluride/ (last visited March 18, 2020). Another stated: "Under the sheet metal, the Palisade and Telluride are the same vehicle. So the short answer to 'What's the difference between the new Palisade and the new Telluride?' is this: almost nothing." Aaron Bragman, *What's the Difference Between the 2020 Hyundai Palisade and 2020 Kia Telluride?*, Cars.com (Jan. 25, 2019), *available at* https://www.cars.com/articles/whats-the-difference-between-the-2020-hyundai-palisade-and-2020-kia-telluride-1420757095946/ (last visited March 18, 2020).

76.    One critical difference, however, is that Kia has acknowledged the defect in its 2020 Telluride windshields and acted to remedy the problem. In late 2019 Kia sent a letter to purchasers of the 2020 Telluride stating: "we have identified that in some instances, customers have reported windshield chipping followed by extensive cracking within a short period of time, thereby preventing repair of the chip." *See* Exhibit 2, hereto.

77.    Even though Kia contended in its letter that the applicable warranty did not specifically cover the defect in the windshields of the 2020 Telluride, Kia

offered to repair any windshields damaged as the result of this defect and make its

customers whole:

> Your vehicle's 2020 warranty specifically excludes
> coverage for broken, chipped, scratched or damaged
> window glass due to outside influence. However, . . . Kia
> would like to provide you with repair support should you
> encounter the issue described above. . . . In an effort to
> ensure customer satisfaction, Kia will replace your
> Telluride's windshield as a goodwill gesture should it
> chip and crack thereby preventing repair of the chip while
> we continue to investigate this matter. . . . Kia will
> provide you with alternate transportation for the duration
> of the windshield repair, if necessary. If you have
> encountered any out-of-pocket expenses associated with
> this issue previously, you may be eligible for
> reimbursement . . . .

78.    As Kia has done, Defendants should recognize the Defect as such and

compensate customers impacted by the Defect and otherwise make them whole.

**E. Defendants Have Actively Concealed the Defect**

79.    Despite their knowledge of the Defect in the Class Vehicles,

Defendants actively concealed the existence and nature of the Defect from

Plaintiffs and Class members. Specifically, Defendants failed to disclose or

actively concealed at and after the time of purchase, lease, or repair:

> a.  any and all known material defects or material nonconformity of the
>     Class Vehicles, including the defects pertaining to the windshield;
>
> b.  that the Class Vehicles, including the windshields, were not in good in
>     working order, were defective, and were not fit for their intended
>     purposes; and
>
> c.  that the Class Vehicles and the windshields were defective, despite the

fact that Defendants knew of the Defect.

80.    When consumers present their Class Vehicles to an authorized Defendants' dealer for windshield repairs, rather than repair the problem under warranty, Defendants' dealers disclaim liability under the warranty.

81.    Defendants have caused Class members to expend money at their dealerships to replace the Class Vehicles' windshields and pay for related repairs, despite Defendants' knowledge of the Defect.

**F. Defendants Have Unjustly Retained A Substantial Benefit**

82.    On information and belief, Plaintiffs allege that Defendants unlawfully failed to disclose the alleged defect to induce her and other putative Class members to purchase or lease the Class Vehicles.

83.    Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiff's.

84.    As discussed above, Plaintiffs allege that Defendants unlawfully induced her to purchase Class Vehicles by concealing and/or omitting a material fact (*i.e.*, the Defect) and that Plaintiffs would have paid less for the Class Vehicle, or not purchased it at all, had she known of the Defect.

85.    Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

**G. Hyundai has Failed to Uphold its Warranties**

86.     Hyundai provided all purchasers and lessees of the Class Vehicles with two warranties relevant to the Defect in each Class Vehicle.

87.     Under the New Vehicle Limited Warranty, Hyundai warrants the "[r]epair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, . . . or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance." *2020 Owner's Handbook & Warranty Information*, 18, *available at* https://www.hyundaiusa.com/content/dam/hyundai/us/com/pdf/assurance/2020_Owners_Handbook_Warranty_r2.pdf (last visited March 19, 2020).

88.     The New Vehicle Limited Warranty is effective for a period of five years from the date of first use of the vehicle or 60,000 miles, whichever occurs first.

89.     Additionally, under the New Vehicle Limited Warranty, "[m]ost service adjustments required as a result of a manufacturing deficiency are covered for the first year or 12,000 miles, whichever occurs first." *Id.*

90.     Hyundai also provides a Replacement Parts and Accessories Limited Warranty ("Replacement Warranty") covering "repair or replacement of any Hyundai Genuine Replacement Part or Accessory supplied from Hyundai Motor America which is found to be defective in material or workmanship under normal

use and maintenance." *Id.* at 45. This warranty covers parts and accessories that were sold and installed by an Authorized Hyundai Dealership, which "will be repaired or replaced without charge for parts/accessories and labor;" it also covers the repair and replacement of parts and accessories that were not installed by an Authorized Hyundai Dealership, excluding labor costs. *Id.*

*91.* The Replacement Warranty applies for one year from the date of first use with no limitations on mileage. *Id.*

92. Hyundai represents that the New Vehicle Limited Warranty and the Replacement Warranty "apply to the vehicle regardless of a change in ownership, and are transferable to subsequent owners." *Id.* at 17.

93. Hyundai routinely denies the warranty claims of owners and lessees of the Class Vehicles regarding windshields damaged by the Defect. Hyundai fails to tell those individuals that their vehicles are defective and continues to represent that the spontaneous or otherwise inexplicable chipping and cracking caused by the Defect is not in fact the result of a defect in the Class Vehicle.

94. Hyundai also routinely evades its warranty obligations in regards to adjustments made in connection with the replacement of windshields on account of the Defect, *e.g.*, realigning or adjusting rearview cameras, HUD components, or other ancillary safety systems.

95. Furthermore, Hyundai has failed to uphold its obligations under the Replacement Warranty to repair or replace defective replacement windshields.

96.     All of Plaintiff's and Class members' Class Vehicles at issue in this complaint were within the mileage and time limits of the New Vehicle Limited Warranty and the Replacement Warranty when the windshields needed to be replaced.

97.     In many instances, consumers have incurred and will continue to incur expenses for the repair of the Defect (despite such defect having been contained in the Class Vehicles when manufactured by Defendants), replacement of the Class Vehicle windshield, the related adjustment of components relating to the windshield, and the replacement or repair or defective replacement windshields. Repairing the Defect in a Class Vehicle can cost upwards of $1,500 per replacement.

## VII.   CLASS ALLEGATIONS

98.     Plaintiffs bring this action on behalf of themselves, and on behalf of the following nationwide class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the nationwide class consists of the following:

> **Nationwide Class**:
> All persons or entities in United States who are current or former owners and/or lessees of a Class Vehicle (the "Nationwide Class").

99.     In the alternative to the Nationwide Class, and pursuant to FED. R. CIV. P. 23(c)(5), Plaintiff Ford seeks to represent the following state subclass only in the event that the Court declines to certify the Nationwide Class above:

**Illinois Subclass:**
All persons or entities in Illinois who are current or former owners and/or lessees of a Class Vehicle (the "Illinois Subclass').

And Plaintiff Forehand seeks to represent the following state subclass only in the event that the Court declines to certify the Nationwide Class above:

**Washington Subclass**:
All persons or entities in Washington who are current or former owners and/or lessees of a Class Vehicle (the "Washington Subclass").

100.   The Nationwide Class, the Washington Subclass, and the Illinois Subclass are referred to herein as the "Class." Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

101.   The Class excludes the following: Defendants, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case. Also excluded are any current or former owners or lessees of Class Vehicles with personal injury claims related to the Defect. Plaintiffs reserve the right to modify, change, or expand the definitions of the Nationwide Class, the Washington Subclass, and the Illinois Subclass based upon discovery and further investigation.

102.   *Numerosity*: The Class is so numerous that joinder of all members is impracticable. At least hundreds of thousands of Class members have been subjected to Defendants' conduct. The class is ascertainable by reference to

records in the possession of HMA and HMC.

103.   *Predominance*: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting individual members of the Class and include:

    a.   Whether the Class Vehicles were sold with a Defect;

    b.   Whether Defendants knew of the Defect at the time of sale;

    c.   Whether Defendants failed to disclose the Defect;

    d.   Whether Defendants actively concealed the Defect;

    e.   Whether a reasonable consumer would consider the Defect or its manifestation to be material;

    f.   Whether Defendants breached express and/or implied warranties;

    g.   Whether Defendants must disclose the Defect; and

    h.   Whether Defendants violated consumer protection statutes and the other claims asserted herein.

104.   *Typicality*: Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of Defendants' conduct in designing, manufacturing, marketing, advertising, warranting, and selling the Class Vehicles. All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all Class members were injured in the same manner by Defendants' uniform course of conduct described herein.  Plaintiffs and all Class members have the same claims against Defendants relating to the conduct alleged herein, and the same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class members.  Plaintiffs and all Class members sustained

economic injuries including, but not limited to, ascertainable losses arising out of Defendants' course of conduct as described herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

105. *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, breaches of warranties, product liability, product design defects, and state consumer fraud statutes.

106. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable, and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

107.   *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

108.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY, U.C.C. § 2-313

**(By Plaintiffs on Behalf of the Nationwide Class, and, in the alternative, by Plaintiff Ford on behalf of the Illinois Subclass and by Plaintiff Forehand on behalf of the Washington Subclass)**

109.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

110.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class and, in the alternative, on behalf of their respective state subclasses.

111.   "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-313(a)(1).

COMPLAINT

112.   Defendants' warranty of the Class Vehicles is an express warranty within the meaning of U.C.C. § 2-313.

113.   The express warranty covers the Defect and any damage proximately caused by the Defect, including repair or replacement of the Class Vehicle.

114.   Plaintiffs and Class members reasonably and justifiably relied on Defendant's express warranty when purchasing the Class Vehicles.

115.   The express warranty fails of its essential purpose to the extent it excludes the Defect because: (1) the Defect unreasonably hinders the safe, normal, and foreseeable use of the Class Vehicles; (2) the Defect is not caused by improper use, neglect, accident, or any other cause outside of Defendants' control; and (3) Defendants are unable or unwilling to provide an adequate, effective, and lasting remedy and return the Class Vehicles to warranted condition.

116.   Defendants breached the express warranty because the Defect constitutes a defect in material or workmanship and Defendants are unable or unwilling to provide an adequate, effective, and lasting remedy and return the Class Vehicles to warranted condition.

117.   Defendants' breach deprived Plaintiffs and Class members of the benefit of the bargain.

118.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

COMPLAINT

## SECOND CAUSE OF ACTION

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(By Plaintiffs on Behalf of the Nationwide Class, and, in the alternative,**

**by Plaintiff Ford on behalf of the Illinois Subclass and by Plaintiff**

**Forehand on behalf of the Washington Subclass)**

119.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

120.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class and, in the alternative, on behalf of their respective state subclasses.

121.   Hyundai is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

122.   With respect to leases, Hyundai is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

123.   The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

124.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under the Uniform Commercial Code and relevant state law.

125.    Hyundai knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Hyundai directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiffs and members of the Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Hyundai knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs and members of the Class, with no modification to the defective windshields.

126.    Hyundai provided Plaintiffs and Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

127.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their windshields that were manufactured, supplied, distributed, and/or sold by Hyundai were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their windshields would be fit for their intended use while the Class Vehicles were being operated.

128.    Contrary to the applicable implied warranties, the Class Vehicles and their windshields at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective materials, design and/or manufacture of

their windshields and the existence of the Defect at the time of sale or lease and thereafter. Hyundai knew of this defect at the time these sale or lease transactions occurred.

129.   As a result of Hyundai's breach of the applicable implied warranties, Plaintiffs and members of the Classes of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and members of the Classes were harmed and suffered actual damages in that the Class Vehicles' windshields are substantially certain to crack or otherwise fail before their expected useful life has run.

130.   Hyundai's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

131.   Plaintiffs and members of the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Hyundai's conduct described herein.

132.   Plaintiffs and members of the Class were not required to notify Hyundai of the breach because affording Hyundai a reasonable opportunity to cure its breach of warranty would have been futile. Hyundai was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class members, from repairs and/or replacements of the windshields or

components thereof, and through other internal sources.

133.   As a direct and proximate cause of Hyundai's breach, Plaintiffs and members of the Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs and members of the Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

134.   As a direct and proximate result of Hyundai's breach of the implied warranty of merchantability, Plaintiffs and members of the Class have been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

**BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT**

**(15 U.S.C. § 2301, et seq.)**

**(By Plaintiffs on Behalf of the Nationwide Class)**

135.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

136.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class.

137.   Plaintiffs and Class members are each a "consumer" within the meaning of 15 U.S.C. § 2301(3).

138.   Defendants are each a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4) and (5).

139.   The Class Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

140.   Defendants' warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

141.   Defendants' implied warranty of merchantability implied in the contract for sale of the Class Vehicles is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

142.   The amount in controversy of each individual claim is greater than $25 and the amount in controversy is greater than $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

143.   The warranties cover the Defect and any damage proximately caused by the Defect, including repair or replacement of the vehicle.

144.   Plaintiffs and Class members reasonably and justifiably relied on Defendants' warranty when purchasing the Class Vehicles.

145.   Defendants represented to Plaintiffs and Class members that the Class Vehicles were merchantable, high-quality, durable, and safe.

146.   The Defect caused the Class Vehicles to fail to conform to Defendants' representations.

COMPLAINT

147.   The Defect caused the Class Vehicles to be unfit for their ordinary purposes because the Defect prevents consumers from safely driving the Class Vehicles.

148.   The warranty fails of its essential purpose to the extent it excludes the Defect because the Defect unreasonably hinders the safe, normal, and foreseeable use of the Class Vehicles, the Defect is not caused by improper use, neglect, accident, or any other cause outside of Defendants' control, and Defendants are unable or unwilling to provide an adequate, effective, and lasting remedy and return the Class Vehicles to warranted condition.

149.   Defendants' exclusion of implied warranties is void to the extent it excludes a warranty of merchantability applicable to the Defect because the Defect causes the warranty to fail of its essential purpose.

150.   Defendants breached the warranty because the Defect constitutes a defect in material or workmanship and Defendants are unable or unwilling to provide an adequate, effective, and lasting remedy and return the Class Vehicles to warranted condition.

151.   Defendants breached the implied warranty because the Defect causes the Class Vehicles to fail to conform to Defendants' representations and to be unfit for their ordinary purpose and Defendants are unable or unwilling to provide an adequate, effective, and lasting remedy and return the Class Vehicles to warranted condition.

152.   Defendants' breach deprived Plaintiffs and Class members of the benefit of the bargain.

153.   Accordingly, Defendants have also violated 15 U.S.C. § 45(a)(1) by way of 15 U.S.C. § 2310(b).

154.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

## FOURTH CAUSE OF ACTION

### COMMON LAW FRAUD

**(By Plaintiffs on Behalf of the Nationwide Class and, in the alternative, By Plaintiff Ford on Behalf of the Illinois Subclass and by Plaintiff Forehand on Behalf of the Washington Subclass)**

155.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

156.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class and, in the alternative, on behalf of their respective state subclasses.

157.   Hyundai committed fraud by failing to disclose and actively concealing, at the point of sale and otherwise, that the windshields in Class Vehicles are defective and pose a safety hazard. Hyundai concealed the truth about the defect, intending for Plaintiffs and the Class to rely – which they did.

158.   A reasonable consumer would not have expected the windshield to suffer from the defect described herein. Plaintiffs and the members of the Class did not know of the facts which were concealed from them by Hyundai. Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, unravel the deception on their own.

159.   Hyundai had a duty to disclose the defect. Hyundai had such a duty because the true facts were known and/or accessible only to it and because it knew these facts were not known or reasonably discoverable by Plaintiffs or the members of the Class.

160.   As a direct and proximate result of Hyundai's conduct, Plaintiffs and members of the Class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for windshield diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Hyundai has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

161.   Based on the foregoing, Plaintiffs are entitled to all remedies available, including refunds, actual damages, liquidated damages, punitive damages, attorney fees and other reasonable costs.  Plaintiffs and Class members request that the Court award equitable relief, including an order requiring Hyundai

to adequately disclose and repair the windshield defect and an order enjoining Hyundai from incorporating the defective windshields into its vehicles in the future.

162.   Hyundai's acts and omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the classes; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to punish them and deter such conduct in the future, which amount shall be determined according to proof at trial.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT

**(By Plaintiffs on Behalf of the Nationwide Class, and, in the alternative, by Plaintiff Ford on behalf of the Illinois Subclass and by Plaintiff Forehand on behalf of the Washington Subclass)**

163.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

164.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class and, in the alternative, on behalf of their respective state subclasses.

165.   This claim is pled in the alternative to Plaintiffs' contract-based claims.

166.   Defendant knew or should have known that Plaintiffs and the Class paid for the Class Vehicles with the expectation that they would perform as represented and were free from defects.

167.   Plaintiffs and the Class conferred substantial benefits on Defendant by purchasing the defective Class Vehicles. Defendant knowingly and willingly accepted and enjoyed those benefits.

168.   Defendants' retention of these benefits is inequitable.

169.   As a direct and proximate cause of Defendants' unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

### SIXTH CAUSE OF ACTION

**VIOLATIONS OF THE**

**ILLINOIS CONSUMER FRAUD**

**AND DECEPTIVE BUSINESS PRACTICE ACT ("IFCA")**

**(815 ILCS 505, *et seq.*)**

**(By Plaintiff Ford on Behalf of the Illinois Subclass)**

170.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

171.   Plaintiff Ford asserts this cause of action on behalf of himself and the Illinois Subclass.

172.   Hyundai has violated the ICFA's prohibition on deceptive conduct in that it used unconscionable business practices by failing to disclose, at the point of sale or otherwise, that the windshields in Class Vehicles are defective and pose a safety hazard.

173.   Hyundai has violated Illinois' prohibition on unfair conduct because its acts, omissions, policies, and course of conduct: (1) offend public policy; (2) are immoral, unethical, oppressive, and unscrupulous; (3) cause substantial injury to consumers in violation of the ICFA.  Its unfair business practices include failing to disclose, at the point of sale or otherwise, that the windshield in Class Vehicles are defective and pose a safety hazard.

174.   As a direct and proximate result of Hyundai's conduct, Plaintiff Ford and other members of the Illinois Subclass have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for Windshield repairs, replacements, and re-calibrations, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Hyundai has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

175.   Plaintiff Ford seeks damages and appropriate equitable relief, including an order requiring Hyundai to adequately disclose and repair the

windshield defect, and an order enjoining Hyundai from incorporating the defective windshield into its vehicles in the future.

176.   Based on the foregoing, Plaintiff Ford and the Illinois Subclass are entitled to all remedies available pursuant to the IFCA, including refunds, actual damages, liquidated damages, punitive damages, attorney fees and other reasonable costs.  Plaintiff Ford and the Illinois Subclass also request that the Court award equitable relief, including an order requiring HMC to adequately disclose and repair the windshield defect and an order enjoining HMC from incorporating the defective windshield defect into its vehicles in the future.

## SEVENTH CAUSE OF ACTION

**VIOLATIONS OF THE WASHINGTON CONSUMER**

**PROTECTION ACT**

**(Wash. Rev. Code. 19.86, *et seq*.)**

**(By Plaintiff Forehand on Behalf of the Washington Subclass)**

177.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

178.   Plaintiff Forehand brings this claim on behalf of herself and the Washington Subclass.

179.   Defendants are "persons" within the meaning of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.010(1), and

conduct "trade" and "commerce" within the meaning of the WCPA, WRC § 19.86.010(2).

180.    Plaintiff Forehand and members of the Washington Subclass are "persons" within the meaning of the WCPA, Wash. Rev. Code § 19.86.010(1).

181.    In the course of Hyundai's business, Hyundai intentionally or negligently concealed and suppressed material facts concerning the Defect affecting the windshields of the Class Vehicles. Defendants accomplished this by failing to disclose the known risk of the windshield chipping and cracking without warning, denying warranty claims arising from the defect, and denying the existence of the defect.

182.    Defendants thus violated the WCPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

183.    Hyundai intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Washington Subclass.

184.   Hyundai knew or should have known that its conduct violated the WCPA.

185.   Defendants owed Plaintiff and Washington class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it:

    a.  Possessed exclusive knowledge of the Defect;

    b.  Intentionally concealed the Defect from consumers; and

    c.  Made incomplete or negligent representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the Washington Subclass.

186.   Defendant's acts and omissions have also been unfair because they have caused substantial injury to consumers without any countervailing benefit. The conduct has been unethical and unscrupulous.

187.   Plaintiff and Washington Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Hyundai's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Washington Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of her vehicle, as well as lost or diminished use.

188.    Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

189.    As a direct and proximate result of Hyundai's actions described above, Plaintiff and the Washington Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, treble damages, and reasonable attorneys' fees, pursuant to Wash. Rev. Code § 19.86.090.

## **RELIEF SOUGHT**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.    Determination that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class(es) as defined above;

B.    Appointment of Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.    Award pre-judgment and post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants' to repair, recall,

and/or replace the Class Vehicles and to extend the applicable

warranties to a reasonable period of time, or, at a minimum, to

provide Plaintiffs and Class members with appropriate curative notice

regarding the existence and cause of the design defect;

F.     Award reasonable attorney's fees and costs; and

G.     Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs and the Class members hereby demand trial by jury of all issues triable as of right by jury.

Dated:  May 12, 2020

Respectfully submitted,

**BAIRD LAW FIRM,**

*/s/ William A. Baird*
William A. Baird, Esq.
w.baird.law@gmail.com
2625 Townsgate Road, 330
Westlake Village, Ca. 91361
Telephone: (805)-267-1209

**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio *
Jason S. Rathod *
412 H Street NE, Suite 302
Washington, D.C. 20002
Tel: (202) 470-3520
Email: nmigliaccio@classlawdc.com
Email: jrathod@classlawdc.com

Daniel C. Levin *
Charles E. Schaffer *
Nicholas J. Elia *

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEVIN SEDRAN BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Email: dlevin@lfsblaw.com
          cschaffer@lfsblaw.com
          nelia@lfsblaw.com

*Attorneys for Plaintiffs*

* *pro hac vice* admission to be sought

COMPLAINT